## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:                                    )
                                          )        Chapter 7
Carlton Dana Pratt                        )        Case No. 98-20291
and                                       )
Christie Ann Pratt,                       )
                                          )
        Debtors                           )
****************************               )
                                          )
Carlton Dana Pratt                        )
and                                       )
Christie Ann Pratt,                       )
                                          )
        Plaintiffs,                       )
                                          )        Adversary Proceeding
v.                                        )        No. 04-02007
                                          )
General Motors Acceptance                 )
Corporation,                              )
                                          )
        Defendant                         )
****************************

### Memorandum of Decision

Before me on a stipulated record is Carlton and Christie Ann Pratt's complaint seeking

sanctions against General Motors Acceptance Corporation (GMAC) for asserted violations of the

Bankruptcy Code's discharge injunction.  Sure enough, GMAC's post-discharge refusal to

release its security interest in the Pratts' car, coupled with its refusal to repossess the vehicle, has

hobbled the Pratts' efforts to be shed of their car-related financial frustrations.  But, in this

Chapter 7 case converted from Chapter 13, GMAC's conduct does not violate § 524(a)'s[1]

---

[1]        Unless otherwise indicated, all references to statutory sections are to the
Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101
et seq.

1

injunctive provisions.

.                                        **Background**

Carlton Pratt purchased a 1994 Chevrolet Cavalier from Frank Galos Chevrolet, Inc., in

Saco, Maine, on March 2, 1994.  He financed the purchase through a GMAC program and

GMAC came to hold the note, secured by a perfected, purchase money lien.

Carlton and Christie filed a Chapter 13 petition on March 4, 1998, scheduling the

Cavalier with a value of $4,900.00 and GMAC's claim at $3,227.37.  GMAC filed its secured

proof of claim in the amount of $3,291.35, which was allowed with 5.5% interest.  In the course

of the Chapter 13 case, GMAC received distributions totaling $1,083.62 from the Chapter 13

trustee.

The Pratts converted their case to Chapter 7 on May 10, 1999, and, pursuant to

§ 521(2)(A), stated their intention to surrender the Cavalier.  Factoring in interest, and deducting

the Chapter 13 distribution, the amount remaining on GMAC's secured claim at conversion was

$2,620.72.  On June 29, 1999, GMAC received relief from stay to realize upon its lien, and on

July 1, 1999, GMAC dispatched to the Pratts a "Notice of Right to Cure Default."  On July 27,

1999, GMAC wrote off the remaining contract balance, which it figured at $2,510.83, on its

books.[2]  On August 17, 1999, the Pratts received their discharge.

GMAC made no attempt to enforce its security interest in the Cavalier.  It calculated that

the expense of repossession and sale exceeded what it would realize by the effort.  On September

20, 1999, the Pratts asked GMAC to take possession of the car, but GMAC refused.  On October

_____

[2]         The parties' stipulation includes an exhibit detailing the account history and
balance.  For our purposes, the difference between the allowed secured claim, as reduced by plan
distributions at conversion, and the contract balance later written off by GMAC is immaterial.

2

1, 1999, the Pratts' attorney requested that GMAC remove the Cavalier from their rented

residence.[3]  Again, GMAC refused, informing him that it had determined not to repossess the

car.

Ten months later, someone representing herself to be Carlton's sister called GMAC,

claiming she had purchased the car.  She asked that GMAC release its lien.  GMAC stated it

would not do so until it was fully paid.  The next day, the Pratts' counsel again wrote GMAC

asking for a lien release - and again was refused.

In December 2003 the Pratts called GMAC asking that the title be cleared so they could

dispose of the car.  GMAC replied that it would release its lien only upon payment of the loan.

A follow-up call from the Pratts' attorney confirmed GMAC's position.

On December 17, 2003, the Pratts had the Cavalier towed to the Frank Galos dealership

and left it there.  The same day, the Pratts' counsel again demanded that GMAC release its lien.

All the while, GMAC maintained its position that it would not voluntarily release its lien without

payment of all amounts owed it on the car loan.[4]

In addition to the foregoing factual stipulations, the parties have agreed on other, broader

points:

Although GMAC has no written policy on the point, it does not ordinarily

---

[3]    On several occasions the Pratts' landlord demanded that they remove the Cavalier
from his property.  Although it is not essential to my holding, I can readily infer from the
stipulated facts that the car was inoperable, or practically so, at the time the Pratts converted
their case to Chapter 7.

[4]    The dealership threatened to tow the Cavalier back to the Pratts' residence, or to
their attorney's house. The dealer and GMAC had their own differences about the car's
disposition, storage charges, and other matters.  Those issues are not germane to the Pratts'
complaint.

repossess a vehicle that a bankruptcy debtor intends to surrender if the cost of repossession and disposal exceed the vehicle's value.

After entry of the discharge order, "GMAC never initiated a contact with the Pratts or any other person or entity seeking to collect any amounts owing to GMAC as a personal liability of the Pratts."

After entry of the discharge order, the only activities GMAC took with regard to the Cavalier or the loan was "to receive and respond to contacts initiated by others, including the Pratts...."

"At no time after the issuance of [the] discharge did GMAC ever state that the Pratts owed to GMAC or to anyone else money outstanding under the terms of the [car loan], except to the extent that" it stated that "it would release its lien" only "upon payment in full of all such amounts."

## Discussion

The Pratts contend that GMAC's post-discharge actions amount to attempts to collect the outstanding contract balance from them personally. GMAC urges that its post-discharge activities constituted only permissible, continuing reliance on its enduring lien. We will begin by considering the force and content of the discharge injunction, how it is enforced, and then assess GMAC's conduct.

## I.  Discharge and the Discharge Injunction

The Pratts' Chapter 7 discharge operated to discharge them "from all debts that arose before the date of the order for relief." 11 U.S.C. § 727(b). It continues to operate "as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2).

Discharge carries with it an injunction against debt collection efforts. The injunction imposed by Code § 524(a)(2) is intentionally broad in scope and is intended to preclude virtually all actions by a creditor to collect personally from the debtor. The House and Senate Reports made clear this intention:

4

> The injunction is to give complete effect to the discharge and to
> eliminate any doubt concerning the effect of the discharge as a
> total prohibition on debt collection efforts.  This paragraph has
> been expanded over a comparable provision in [the] Bankruptcy
> Act . . . to cover any act to collect, such as dunning by telephone or
> letter, or indirectly through friends, relatives, or employers,
> harassment, threats of repossession, and the like.  The change is ...
> intended to ensure that once a debt is discharged, the debtor will
> not be pressured in any way to repay it.

3 William L. Norton, Jr., <u>Norton Bankruptcy Law and Practice 2d</u> (hereinafter "<u>Norton</u>") § 48:3,

at 48-7 (1997) (footnote deleted); <u>see</u> <u>Bessette v. Avco Fin. Servs., Inc.</u>, 230 F.3d 439, 444 (1st

Cir. 2000) ("Generally, a discharge in bankruptcy relieves a debtor from all pre-petition debt,

and § 524(a) permanently enjoins creditor actions to collect discharged debt."); <u>Doughty v. Holt</u>

<u>(In re Doughty)</u>, 195 B.R. 1, 4 (Bankr. D. Me. 1996).

The bankruptcy court can invoke § 105(a)[5] to enforce § 524(a)'s discharge injunction.

<u>Bessette</u>, 230 F.3d at 445.  Redress can take the form of damages, attorney fees, and, in

appropriate cases, punitive damages.  <u>Id.</u>  Discharge injunction enforcement proceedings are in

the nature of civil contempt.  <u>Id.</u>

### A.  Burden of Proof

GMAC argues that a finding of civil contempt must rest on clear and convincing

evidence.  Generally speaking, that proposition is true.  <u>Accusoft Corp. v. Palo</u>, 237 F.3d 31, 47

---

[5]     Section 105(a) provides:

The court may issue any order, process, or judgment that is necessary or
appropriate to carry out the provisions of this title.  No provision of this title
providing for the raising of an issue by a party in interest shall be construed to
preclude the court from, sua sponte, taking any action or making any
determination necessary or appropriate to enforce or implement court orders or
rules, or to prevent an abuse of process.

(1st Cir. 2001); Gemco Latinamerica, Inc., v. Seiko Time Corp., 61 F.3d 94 (1st Cir. 1995). The

Pratts posit that violations of the statutory discharge injunction stand on a different footing. In

their view, enforcing the discharge injunction via § 105 is like enforcement of similar Code

provisions - where clear and convincing evidence is not required. See, e.g., § 362(h); Fleet

Mortgage Group, Inc. v. Kaneb (In re Kaneb), 196 F.3d 265 (1st Cir. 1999) (discussing willful

violation of the automatic stay and determining that relief may be obtained if the offending party

knew of the stay and intended the action that violated it).

　　　The Pratts' position has much to recommend it, given the statute's clarity, and the

essential role discharge plays in the Code's "fresh start" objective.   Bessette recognized that

§ 524(a) is enforced by way of § 105(a), rather than directly, in proceedings styled "civil

contempt."  The cases cited by the Bessette court do not discuss burden of proof directly,

although, on balance, they adopt the same "willfulness" elements as the First Circuit recognized

in Kaneb.  Those elements (knowledge of the order, willful action that violates the order) do not

fit with a "clear and convincing" burden of proof.  See Hardy v. United States (In re Hardy), 97

F.3d 1384, 1389-90 (11th Cir. 1996) (citation for contempt under the court's inherent powers

made only upon a showing of "bad faith," whereas liability for contempt of § 524 injunction

under § 105 lies if defendant *willfully* violated § 524); In re Elias, 98 B.R. 332, 337 (N.D. Ill.

1989) ("It is enough if the order violated is specific and definite, and that the offending party has

knowledge of it."); but see In re Arnold, 206 B.R. 560, 568 (Bankr. N.D. Ala. 1997) (sanctions

for violation of discharge injunction can issue through court's inherent powers on showing of

bad faith or "malevolent intent"); cf. In re Rostek, 899 F.2d 694, 697 (7th Cir. 1990) (affirming

award of sanctions without mention of § 105, and holding that creditor waived argument that

proof of willfulness was required).  Moreover, the First Circuit has expressly recognized that

enforcement of the statutory discharge injunction, as compared to enforcing an injunction

"individually crafted" by a judge, is a straightforward exercise.  <u>Bessette</u>, 230 F.3d at 446

(enforcing the discharge injunction does not call for consideration of the judge's "insights and

thought processes" as would be pertinent to enforcing a custom-made injunction).

It would seem that proving a violation of the discharge injunction, actionable by way of a

§ 105(a) contempt proceeding, should only require proof by a preponderance of the evidence that

the offending creditor knew of the bankruptcy discharge and took willful action in violation of

the discharge injunction.  Section 524(a)'s injunction is as critical to a deserving debtor's fresh

start as the Code's automatic stay is to providing immediate relief to the financially distressed

debtor.  <u>See</u> <u>Soares v. Brockton Credit Union (In re Soares)</u>, 107 F.3d 969, 975 (1st Cir. 1997).

Its enforcement should be no more burdensome.[6]  However, finally resolving the point today is

unnecessary.  As set out below, the record demonstrates that GMAC did not violate the

injunction *as a matter of law*.

### B.  Lien Enforcement

Creditors who hold valid liens not avoided in the bankruptcy case are free to enforce

those liens against their collateral after the debtor's personal liability has been discharged.  "Any

lien not invalidated or avoided survives the debtor's discharge." 3 <u>Norton</u> § 48:4, at 48-11.

Sections 524(a)(1) and 524(a)(2) specifically enjoin only activities seeking to enforce a debtor's

---

[6]      Creditors will seldom be unaware of the discharge injunction or its content.  <u>See</u>
Fed. R. Bankr. P. 4004(g).   Under § 105(a) the court can craft tailored relief appropriate to
effect a just result on the facts of each case brought before it.

*personal* liability.  A post-discharge action to enforce a surviving lien is an in rem action.  It must proceed without recourse against the debtor for any deficiency.  Id.; see Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 22 (1st Cir. 2002) ("[T]hus, the lienholder's right to repossess is nothing more than a right to an equitable remedy for the debtor's default.  The fact that this surviving right is in rem only limits the recourse that the lienholder can take to repossession or obtaining an amount of money reflecting the value of the collateral.") (citation omitted); see also Johnson v. Home State Bank, 501 U.S. 78, 84 (1991).

Creditors holding valid liens that have "passed through" bankruptcy generally run afoul of the discharge injunction only if they enforce them in ways meant to coerce a debtor's payment of a discharged personal obligation.  This occurs most often when the creditor threatens to repossess collateral that the debtor wants or needs to retain, but, without obtaining a proper reaffirmation agreement, promises to forbear so long as the debtor continues to make payments (which encompass the discharged personal liability):

> Prior to adoption of the Code, many debtors in liquidation cases were in fact denied the benefits of discharge due to threatened repossessions of property by secured creditors who used the leverage of their liens to collect the prior debt.  Congress found these creditor actions to be contrary to bankruptcy policy.  The obvious intention of the Code is to eliminate the problem by expanding the terms of the discharge injunction, providing a statutory right to redeem property from a lien, and providing substantive and procedural restrictions on reaffirmation agreements.  Nevertheless, circumstances may arise in which a debtor exempts property subject to a lien but is unable to redeem the property with cash or a reaffirmation agreement.  In such circumstances, a creditor may attempt to use the threat of foreclosure as leverage to obtain repayment by the debtor.  As in the case of conditional refusals to perform, while repossession does not violate Code § 524(a), the conditional threat is an act designed to collect the debt as a personal liability.

3 Norton § 48:4, at 48-12, -13 (footnotes omitted); see Arruda, 310 F.3d at 22 (creditor sending

proposed agreements for installment redemption of consumer collateral to debtors  post-

discharge, and representing that the alternative would be repossession, did not violate discharge

injunction because creditor did not attempt to impose personal liability on debtors);  but cf. Jamo

v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392 (1st Cir. 2002) (secured creditor may

condition reaffirmation of residential mortgage obligation on debtors' reaffirmation of other,

discharged, unsecured obligations).

**II.  You Can't Get There From Here**

The twist is that the Pratts complain not about any GMAC threat to repossess their

Cavalier, but about its refusal to do so, coupled with its refusal to remove its lien from the

Cavalier's title.  They claim that GMAC's posture stymied their fresh start, effectively operating

to pressure them to pay what was owed against the car as a personal liability, notwithstanding

their bankruptcy discharge.

**A.  Injunction Issues: Accommodation Not Required**

The Pratts begin by referring to Burr v. Bank of Boston (In re Burr), 160 F.3d 843 (1st

Cir. 1998).  Burr held that § 521(2) "unambiguously requires chapter 7 debtors wishing to retain

property of the estate that secures a consumer debt to elect one of the retention options specified

in 11 U.S.C. § 521(2)(A), and then to perform the elected option in accordance with 11 U.S.C.

§ 521(2)(B)."  Burr, 160 F.3d at 849.  With a lien in place, the retention options are redemption

and reaffirmation.  The option for debtors who do not wish to retain the collateral is "surrender."

The Pratts contend that GMAC has effectively negated the "surrender" option, leaving them with

no choice but to  redeem the car or reaffirm their obligation to it.  This, they say, frustrates their

fresh start because redemption and reaffirmation cost money and are to be available at a debtor's

option, not thrust upon them by creditor action (or inaction).  Their characterization of

redemption and reaffirmation, the so-called "retention options" is spot on.  Redemption and

reaffirmation are avenues by which debtors may *if they choose* and, in reaffirmation's case, *if

they can reach agreement with the secured creditor*, keep personal property they wish not to

replace.[7]

To retain the Cavalier by reaffirmation (assuming GMAC would consent), the Pratts

would be required to reinstate their personal liability for the full balance of the contract price.

And to redeem, they would be required to tender to GMAC the full amount of its "allowed

secured claim."  Either option would cost them money -  to retain a car they did not wish to keep.

They urge that they are entitled to be shed of their obligation to GMAC, in its entirety, by freely

exercising the "surrender option."

---

[7]       Redemption is an "alternative form of relief" for debtors, enabling them to "retain their necessary property and avoid high replacement costs by providing them with a right of first refusal in consumer goods that might otherwise be repossessed or foreclosed upon by creditors." 3 <u>Norton</u> § 69-1, at 69-2, -3.

> An individual debtor <u>may</u>, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

11 U.S.C. § 722 (emphasis added).

Reaffirmations are governed by § 524(c), which addresses an *"agreement* between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a [bankruptcy] case."  11 U.S.C. § 524(c)(emphasis added). Reaffirmation "requires a meeting of the minds."  <u>In re Jamo</u>, 283 F.3d at 397.

GMAC counters that, as a lienholder, it cannot be compelled to retake possession of its collateral. So far, so good. The proposition is manifest.[8] But, it also asserts that it cannot be compelled to release its lien without "full payment." With the Cavalier's abandonment and the estate's administration complete, GMAC asserts that its rights as a "pass through" lienholder vis-a-vis its collateral are governed exclusively by state law, citing <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). And under state law, GMAC may retain its lien (its <u>in rem</u> claim) until it is paid the full amount owed it. <u>See</u> 11 M.R.S.A. §§ 9-404, 9-505.[9]

Of course, <u>Butner</u>'s rule is not absolute. Its deferral to state law is qualified importantly: state law defines the parties' property rights *unless* some federal interest *requires* a different result. Moreover, <u>Butner</u> is usually invoked to address the rights parties bring into the bankruptcy case. Noone would pretend that those rights remain unaltered by, say, the bankruptcy discharge. Here, GMAC's stance ("We don't want the car; we won't release our lien.") rendered simple surrender of the Cavalier a practical impossibility.[10] The Pratts were

---

[8]      GMAC holds a lien interest to secure payment. It does not own the car. The character of its interest and the processes by which it may enforce its lien are defined and regulated by statute. <u>See</u> 29-A M.R.S.A. § 701 <u>et seq.</u> (Creation and perfection of security interests in automobiles).

[9]      The cited sections of Maine's version of the Uniform Commercial Code's Article 9 were in effect when Carlton purchased the Cavalier. They were repealed July 1, 2001, and replaced by 11 M.R.S.A. §§ 9-1513, 9-1623(2), effective that same date.

[10]     GMAC urges that "surrender" under § 521 means surrender to the bankruptcy estate, not to the secured creditor. <u>See In re Claflin</u>, 249 B.R. 840, 849 n.6 (B.A.P. 1st Cir. 2000)

stuck with a vehicle they did not want.  They could not transfer ownership,[11] or even expect to

"junk" the car,[12] without clear title.  But GMAC asserts it did nothing to press the Pratts

personally for payment, that it has merely "responded to inquiries," contrasting its behavior with

that of creditors who have violated the discharge injunction by actively seeking payment of

discharged debts.  E.g., In re Miller, 247 B.R. 224 (Bankr. E.D. Mich. 2000) (landlord's attempt

to collect postpetition rental payments pursuant to rejected lease violated discharge injunction);

In re Andrus, 184 B.R. 311 (Bankr. N.D. Ill. 1995) (creditor's placement of signs on lawn

regarding debtor's unpaid debt and bankruptcy filing found to be attempts to collect discharged

debt, and as such violated discharge injunction); Walker v. M & M Dodge, Inc. (In re Walker),

180 B.R. 834, 843-44 (Bankr. W.D. La. 1995) (failing to halt automatic deduction from

employee's wages for payment of discharged debt violates discharge injunction).

GMAC did not violate the discharge injunction by standing on its lien rights, because

those rights do not impinge on the Pratts' personal discharge.  Its refusal to clear the title without

payment enforced its in rem rights only. If GMAC were to tender the Pratts a reaffirmation

agreement, it could permissibly seek their consent to pay both the *secured and unsecured*

---

(discussing surrender option); cf § 1325(a)(5)(C) (surrender of collateral to secured creditor is
satisfactory treatment of secured claim for Chapter 13 plan confirmation).  To the extent it makes
the point to argue that it cannot be compelled to retake possession of its collateral, the point is
made.  For other purposes, the argument is inapposite.

[11]     The circumstances and stipulated facts make it plain that the phone call to
GMAC, purportedly from Carlton's sister who supposedly had "purchased" the car, was a ruse, a
failed attempt to convince GMAC to release its lien.

[12]     Under Maine law, a junkyard is a "recycler," 29-A M.R.S.A. § 1101 et seq., and,
if it "displays, sells, exchanges, offers to negotiate, negotiates or advertises the sale of rebuilt or
salvage vehicles," it is also a "dealer."  29-A M.R.S.A. § 1101(3).  With an unreleased security
interest encumbering the title, a recycler/dealer cannot resell the car.

portions of its claim.  It did not take even that small step. It merely responded to inquiries by

stating it would release its lien upon payment of what was owed it.  GMAC did not

accommodate the Pratts, but it did not violate the discharge injunction.

### B. Redemption Detour: A Dead End

The parties arguments raised redemption as a remedy the Pratts might have invoked

while they still possessed the car.  However, the requirements for redemption in a post-

conversion Chapter 7 case dictate that GMAC's secured claim, and thus its payment entitlement

for redemption, remained pegged to its Chapter 13 secured claim.  In other circumstances,

however, redemption might have solved the Pratts' conundrum.

In re Groth, 269 B.R. 766 (Bankr. S.D. Ohio 2001), exemplifies how redemption could

serve in a straight Chapter 7 scenario.  In Groth, the debtor declared his intention to surrender a

motorboat.  The boat had been sitting in his yard for years and he considered it valueless.  The

secured creditor claimed the boat was worth $2,000, but it refused to repossess it, or even to

receive it at its repossession facility.  Neither would it release its lien, asserting that the debtor

must go to state court and obtain a "salvage title," a step that would require him to pay it the

boat's salvage value.  Groth, 269 B.R. at 767.  The bankruptcy court held that the debtor could

redeem the boat for a dollar, thus clearing the way for him to dispose of it.  Id. at 768.  The Groth

court commented:

> [A] debtor in a chapter 7 case, as part of his fresh economic start, should be
> permitted to surrender collateral he does not intend to keep.  If the secured
> creditor determines that its collateral is worth less than the cost of taking it into
> its possession, the creditor must waive the effect of its lien so that the debtor is able
> to dispose of the collateral.

Section 722 may not have been enacted specifically as a process by which the payment of a nominal sum can accomplish that result. Such a proposal, however, is consistent with the legislative intent to provide resolution of the status of secured consumer debt in a chapter 7 case as to property the trustee in bankruptcy does not intend to administer. If surrender is impossible, then a debtor may purchase the creditor's interest by nominal payment under the redemption procedure.

Id. at 767-68.

Given the Pratts' case history, the nominal sum redemption alternative, a la Groth, could not apply. Redemption provides a debtor the ability to redeem collateral from a secured creditor's lien by paying the lienor's "allowed secured claim." In a Chapter 7 case that claim would be set at the collateral's value (determined at the time redemption is sought). See 3 Norton § 69:7, at 235 (Supp. 2004) ("Valuation should normally occur at the later of either the filing of the request by the debtor to establish a redemption amount required, or at the date of the redemption proceeding if the request is contested.") (footnote omitted). In a Chapter 7 that has been converted from Chapter 13, however, the "allowed secured claim" is set by the provisions of § 348:

(f)(1) Except as provided in paragraph (2), when a case under chapter 13 of this title is converted to a case under another chapter under this title --

                    *    *    *

(B) valuations of property and of allowed secured claims in the chapter 13 case shall apply in the converted case, with allowed secured claims reduced to the extent that they have been paid in accordance with the chapter 13 plan.

11 U.S.C. § 348(f)(1)(B).[13]  See also 3 Norton § 69:9, at 239 (Supp. 2004). GMAC's Chapter 13 secured claim, less plan distributions, amounted to $2,620.72. Thus, without GMAC's

_____

[13]    Paragraph (2), referred to in the quoted text, addresses bad faith conversions and does not apply.

14

consent to accept a lesser sum, a court-ordered redemption would not have assisted the Pratts.[14]

## III.  The End of the Road?

The Pratts'complaint seeks only damages for violation of the discharge injunction. Since the Cavalier no longer burdens them, they have not sought an order compelling GMAC to release its lien and clear the title.   Were they to do so, I would have to consider carefully whether, absent some fact of considerable force, I could provide them with the relief they sought. After all, an order clearing the title would provide the same result as redemption and, as explained above, the Code determines that redemption in a converted case comes at a statutorily-set price.[15]

We can hope that circumstances like these will arise rarely.  It certainly is not usual for a car, with value fixed by a Chapter 13 plan, to depreciate so precipitously that, upon conversion it is worth not only less than the secured claim as reduced by plan payments, but less than the cost of repossession and sale.  Should the stars align this way again, we can only hope that enlightened self-interest and pragmatism will carry the day.

## Conclusion

For the reasons set forth above, I conclude that GMAC has not violated the discharge injunction.  Judgment in its favor will enter forthwith.

---

[14]     There record is devoid of any reference to the parties' discussing compromise. GMAC steadfastly demanded "all;" the Pratts steadfastly offered "nothing."

[15]     I will not speculate whether, in case similar to this one in all respects except that the debtors have been unable to rid themselves of a scrap car, a secured creditor might be ordered to release its lien through an extra-redemption process, if its post-conversion conduct could be characterized as an *admission* that its collateral held no value for it.

15

April 15, 2005                          /s/ James B. Haines, Jr.

---

Date                                    James B. Haines, Jr.

                                        U.S. Bankruptcy Judge